**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** Plaintiff, | **FILED UNDER SEAL** |
| v. | 1:11-cv-05406 Judge Ronald A. Guzman Magistrate Judge Jeffrey Cole |
| **BELAL K. FARUKI and NEURAL MARKETS, LLC,** Defendants, | |
| **And** | FILED |
| **EVOLUTION QUANTITATIVE 1X FUND and EVOLUTION QUANTITATIVE 1X, LLC,** Relief Defendants. | AUG 1 0 2011 MICHAEL W. DOBBINS CLERK, U.S. DISTRICT COURT |

Marc D. Tishfield, being duly sworn, deposes and says:

1. I am 45 years of age and have worked in the financial industry for approximately 24 years. My educational and professional experience includes an MBA from New York University, 10 years as a markets officer in government securities with the Federal Reserve Bank of New York, and 14 years in the financial services industry. I work in New York City. This affidavit is submitted in support of the SEC's applications in this case.

2. I met Belal K. Faruki (Faruki) some years ago when he was hired as an outside consultant to a firm where I was employed. We became friendly and remained so after he moved on. In approximately April 2007, Faruki approached me about investing in an IT consulting company called Neotick, Inc., of which he was President. I declined that offer. In December 2008, Faruki told me that I "missed the boat" on his claimed "26mm valuation" of the supposed first tranche raise in Neotick and offered me a "head start before our second tranche." I declined this second offer.

3. During the time I corresponded with Faruki we spoke in person, on the telephone, and I received emails from him at the following addresses: bfaruki@neotick.com; bfaruki@neuralmarkets.com and bfaruki@bloomberg.net. I also participated in instant messages with Faruki on the Bloomberg, L.P. instant messaging service.

4. In or about January 2010, Faruki began corresponding with me about investing in a fund that he was managing. Faruki told me that had I invested in Neotick when he had offered, I would have made many times my investment. Faruki told me that he sold Neotick "for a windfall." Faruki said that I should not "miss out on this one" meaning this new fund opportunity.

5. On or about January 21, 2010,M r. Faruki claimed that he "launched my fund" and said that his fund was up over 12% in December 2009 and January 2010 now at 32%. Faruki represented that he "used [his] own dough first" and that his track record would be audited by RSM McGladry, Inc. a reputable accounting firm. Faruki said "I think you will be impressed". Similar kinds of representations continued into February 2010 and later. In or about August 25, 2010 and September 4, 2010, Faruki sent me a number of documents including Neural Markets, LLC's (Neural or Neural Markets) and the Evolution Quantitative 1X Fund (Evolution 1X Fund) promotional materials. In an email cover note dated August 25, 2010, Faruki wrote that "Neural is now accepting managed accounts in the month of September" for a commencement of trading in October. In these materials and elsewhere, Faruki represented to me that Neural's systems employ: "almost zero leverage;" "high-frequency statistical arbitrage;" "Integrated Automatic and risk-driven hedging;" have "returned over 230% since inception in March 2009;" utilize "proprietary computer algorithms that exploit price imbalances based upon mathematical theorems;" and that the Fund provides "daily liquidity to the client – Funds are

available everyday (sic) prior to the close of the markets." The marketing materials also represented that the Fund "is sector agnostic, very liquid and employs little to no leverage." Another statement in the materials says that Portfolio Characteristics include, "Sector agnostic, long-short market exposure to a portfolio of only the most liquid US ETF's (exchange traded funds)." The materials stated that "The Evolution funds are composed of a basket of ETFs listed on U.S exchanges and ECNs." A copy of the August 25, 2010 email is attached as Exhibit A.

6. Copies of marketing materials I received relating to the investment are attached in Exhibit B to this affidavit.

7. The marketing materials I received identified J.P. Morgan Securities, Inc. (JPMS) and Tradestation Securities, Inc. (Tradestation) as the prime brokers for Neural Markets and the Evolution 1X Fund and RSM McGladry, Inc. (McGladry) as the auditor for Neural Markets and the Evolution 1X Fund.

8. In this regard, Faruki told me that he was trading ETFs through an automated electronic "no-touch" system (no human intervention) which goes flat at the end of each trading day, meaning that no positions are carried over night. He described his trading platform as a recursive system utilizing billions of data points; that all trades were statistically and correlation based; that he was conducting high frequency statistical arbitrage (meaning that he was hedging even these trades); and was utilizing no leverage.

9. In his marketing materials, Faruki claimed to be using a quantitative approach to all trading strategies "predicated purely on the existence of a mathematically dominant behavior." These materials also claimed that Faruki employed a "Proprietary, Recursive, time series data mining over Billions of data points", and utilize "Predictive analysis" and a "Proprietary Modeling Calculator." Faruki claimed that Neural Markets would "report

performance metrics on an hourly, daily, weekly or monthly basis" and repeatedly emphasized that there was "little to no use of leverage." In fact and in spite of numerous requests for frequent account updates as promised, Neural Markets only produced an "investor statement" for the month of October 2010 – sent to me on December 8, 2010. Faruki's materials also claimed that he had a "proprietary, low latency platform and toolset incorporating the computing performance and data management necessary to screen, facilitate and execute our strategies." Faruki claimed to employ "exhaustive statistical/mathematical processing" and that the Fund utilized a "low risk, low volatility trading program." In this regard, Faruki told me that the fund is very low risk and that, in fact, he had never had a down period, either a down week or a down month.

10. In August and September 2010 and thereafter,Faruki also told me in oral conversations that any references to simulated trading in written marketing materials were to protect the confidentiality of his wealthy investors whose money he was already managing and that this trading mirrored the strategies described in the marketing materials. Regarding his fund, Faruki told me that he was managing $5,000,000 in investor funds and that he, Faruki, had a large amount of his own money in the fund. Faruki told me that he was very wealthy.

11. On August 31, 2010, Faruki wrote to me and stated that "August turned out to be a very profitable month" for his Fund. Faruki claimed that "August booked a total return, net of fees and commissions of $237,029.59 for a total return of 4.74 % over at trading period of 20 days, 4 hours and 54 minutes averaging .23 % per trading day." Faruki represented that "no leverage was employed this month." Faruki further represented that "the profit of $237,029.59 (4.74%) will be swept to a holding account for further distribution to investors and the account balance will be reset back to $5M for the month of September." Faruki claimed that the "next

account reset" is scheduled for September 30, 2010. A copy of that email is attached as Exhibit C.

12. On or about September 1, 2010, Faruki sent me a Private Placement Memorandum for the Evolution Quantitative 1X Fund (hereinafter the PPM). The PPM stated that "the fund applies quantitative and mathematical models that buy and sell, short and cover listed securities as the automated systems discover price and balances profits opportunities in the markets. All trades executed by the Fund will be automated and computer generated and will account for 100% of the investment decisions made. Except under extraordinary circumstances will non-computer based trades be generated." The PPM also claimed that "algorithmic trading will be used for all investment strategy and decisions." An executed copy of the PPM is attached as Exhibit D.

13. On or about September 5, 2010, Faruki communicated to me that he wanted to formalize a PPM and requested that we finalize this transaction in time to start trading by October 1, 2010. Faruki insisted that we meet very soon because he did not want me to get closed out of the Fund since, he claimed, other investors were about to take up all of the available capacity.

14. On September 6, 2010, Faruki, James N. Barry and I met at the Soho Grand Hotel in Manhattan and discussed proposed terms for my investment and other matters. Faruki explained that he was making so much money in the Fund, and had so much free money to invest, that he wished to diversify and buy hard assets like real estate. Faruki stated that earlier that day he had been downtown with real estate brokers looking at loft apartments in Tribeca. On that occasion and others, Faruki told me that he spends a few months per year in Oahu, Hawaii and owns a condominium there. Faruki also said that he frequently travels to Hawaii on private

jets. Faruki also boasted of owning several Ferrari automobiles, Lamborghinis and other expensive automobiles and buying his wife very expensive and lavish jewelry. Barry said that he and Faruki had done many deals and that they had made a lot of money together.

15. I did not know at the time, but subsequently learned, that at the time these statements were made, Faruki had not paid his mortgage in at least eight months (at approximately $2,722.87 per month), and Deutsche Bank, the mortgage holder, had filed a foreclosure action dated August 21, 2010.

16. During the meeting in New York City, Faruki pushed me to commit to an investment in the fund stating that if I delayed, I would be shut out. Faruki stated that he had a substantial amount of his own money invested in the Fund. Barry told me that he was investing in the Fund as of October 1, 2010. Later, at dinner with just Faruki and me, Faruki stated that "we have been killing it," that he had made Barry lots of money in prior deals, and suggested that no other fund had these kinds of returns. Faruki said that "I am making my investors rich." He further asked me not to share my investment terms with Barry because, according to Faruki, mine were more favorable.

17. On September 8 and 9, 2010, Faruki circulated signature pages to the Evolution Quantitative 1X Fund. The date of the PPM is September 1, 2010. I was solicited to sign the PPM and did so on September 8, 2010, but did not transfer any money on that date. See Exhibit D.

18. Faruki contacted me throughout September 2010 imploring that I sign the remaining documents and wire the investment so that that I would not lose my "opportunity" to invest in the Fund.I n these communications, Faruki assured me that he was managing $5 million in investor money and had additional commitments from other investors to invest in his fund.

19. On September 16, 2010, I had another meeting with Faruki and another individual. During that meeting,Faruki arrived late claiming, yet again, that he was with his real estate broker looking at lofts downtown to purchase. Faruki also said that he had met with JPMS and TradeStation in New York about his clearing and rebate arrangements. During the meeting, Faruki told me that he would be personally overseeing the Fund and the trading in the accounts for the investors. Faruki again stated that he currently had $5,000,000 under management from several wealthy investors. I asked Faruki for their names for due diligence purposes but declined to disclose all of them claiming privacy concerns.

20. In a Bloomberg instant message conversation on September 28, 2010, I discussed with Faruki the performance of the $5 million in investor funds that he told me he was managing. He responded that the market and other factors were affecting all of his returns including "…5 m simulated, 5 m real..." A printout of that conversation is attached to this affidavit as Exhibit E.

21. Based upon the written and oral representations described above made by Faruki and others, on September 28, 2010, I wired $1,000,000 to Neural Markets account at J.P. Morgan Chase Bank, N.A. so that I could participate in the Evolution 1X Fund and its claimed investment strategy. I understood that in exchange for my investment I would receive 10 units of the Evolution 1X Fund and also a 1% equity interest in Neural Markets (which was never delivered.).

22. Thereafter, Faruki made numerous additional representations to me about the operation of the Evolution 1X Fund and its performance. In early October 2010, he reported that the fund was up. On October 18, 2010, Faruki communicated via Bloomberg instant messaging that trading for the Evolution1X Fund was profitable. In this message, Faruki also told me I

would be given live access to view and confirm investments but that never happened. Bloomberg instant message conversations attached as Exhibit F.

23. On November 8, 2010, Faruki informed me that there was a significant trading error with TradeStation. Faruki blamed losses on, among other things, the supposed TradeStation error, stating that the error was "in our favor" which meant that Tradestation owed Evolution 1X Fund money. On November 15, 2010, Faruki told me that because TradeStation denied the error, "we are not back to break even yet." He also stated that "We have filed a claim with the NFA regarding the TS [Tradestation] error." Four days later, in another email Faruki again told me there was "no need for you to be concerned. Nothing catastrophic [has] happened." Copies of November 8 and 9, 2010 Bloomberg instant message conversations and November 15 and 19, 2010,e mails attached as Exhibit G.

24. I was told that my funds would go to Neural Markets, LLC and Evolution Quantitative 1X Fund. I was never told that the funds would be transferred to any other entity.

25. My repeated demands for the return of the balance of the monies I invested have been ignored. Faruki and the lawyer for him and the fund,Ma rk A. Hopkins of Hopkins & Associates (Hopkins), who was also a member of Neural Markets, LLC, have threatened, in writing, to take the balance of my monies and use it to defend themselves and pay themselves "fees" unless I tell them about any investigations of their conduct and stop all such investigations.

26. As of December 22, 2010, Hopkins confirmed in a letter to my counsel that approximately $740,000.00 of my funds remained in a domestic account. A copy of the letter is attached as Exhibit H.

27. I have grave concerns about the balance of my money and Faruki's (and others affiliated with Faruki) ability to use my monies for their own purposes and their ability to abscond with my funds.

28. I have more information about these matters which I have not set forth herein.

I, Marc D. Tishfield, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Executed on the 9th day of August, 2011.

Marc D. Tishfield

Marc D. Tishfield